Opinion issued August 28, 2018



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00488-CV

_____

**ROBERT GULLEDGE AND DIANA GULLEDGE, Appellants**

**V.**

**WARREN WESTER AND THEODORE SULLIVAN, Appellees**

On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Case No. 16-CV-1022

# O P I N I O N

In this negligent nuisance case, Clear Lake Shores residents, Robert and Diana

Gulledge, were permanently enjoined from finishing construction of a second story

deck on their boathouse after two neighbors complained that the tall structure would

block their water views. The Gulledges appeal, contending that there is legally and

factually insufficient evidence to support the nuisance claim and injunction. Alternatively, they contend that the injunction is broader than the pleadings and evidence permitted.

We reverse and render.

## Background

Roughly a dozen homes are located on Blue Point Road, a waterfront community in Clear Lake Shores. The homes are located in a "unique area" of the Clear Lake channel, where the water is particularly deep and provides direct access to the Gulf of Mexico for large boats heading to sea. Through a licensing process with the State, residents can construct boathouses in the channel that function as garages for their boats. These combined features make the community attractive to people who own large boats and want to store them in attached boathouses. There are no other neighborhoods nearby with such deep-water access.

One expert testified that it is "very difficult to find water this deep up to a residential lot. . . . It's a very limited commodity, and it's very valuable." The expert explained that there are only two places "in the Galveston Bay system" where someone can store boats 40-feet and longer behind their homes. According to the expert, there is "a relationship between the depth of the water and what size boats you might expect people would be able to utilize or berth behind their houses on Blue Point Road." And "if it's a big boat, it's going to require a big boathouse."

Another witness testified about the Blue Point subdivision, "You're not limited to the size [boat] that you could bring in."

Thus, the ability to store a large boat at your home rather than at a marina is one of the attractions of the Blue Point subdivision.

There are also aesthetic features that make the neighborhood attractive to homeowners. To varying degrees, community residents have views of the channel, Seabrook Shipyard, and the nearby Kemah bridge. From their properties, they can watch local boat parades and the "very busy" passing boat traffic entering and exiting the channel.

The Blue Point subdivision homeowners are bound by various community restrictions, including a restriction that home structures cannot be placed within five feet of the property lines or the waterline. But there are no community or city restrictions regarding the height of residents' boathouses. The view of the channel and other features is impacted by the size and design of neighboring boathouses. Many are close to 20 feet tall, and at least one is 25 feet tall.[1] They have varying lengths to accommodate the boats being stored, and one boathouse is 81 feet long. Some boathouses have an open design, while others are enclosed. Without community restrictions, Blue Point residents do not have complete control over their

---

[1] According to a boathouse architect, the average heights vary from 14 to 28 feet. He has never designed a boathouse larger than 34 feet tall.

water views, and the size and type of boathouse their neighbors chose to construct has the potential to diminish their water views.

The homes on Blue Point Drive run north-south, and the channel is to the east of the homes. In 2011, Robert and Diana Gulledge bought a home between the homes of Warren Wester and Theodore Sullivan. Their homes, relative to one another, are shown on the diagram below:



The lots are relatively narrow. Most are 50 feet wide, but Sullivan's is 70 feet wide. Like many of their neighbors, the Gulledges had a boathouse, which held a 40-foot boat. In 2015, they bought a larger, 55-foot Azimut yacht and decided to construct a larger boathouse to store it. Their design called for a 60-feet long and 20-

4

feet wide boathouse with a height of 25 feet above mean tide. This height was necessary to provide sufficient clearance for the Azimut.[2]

The Gulledges submitted a construction application to the State's General Land Office. This was required because the community's boathouses are not located on private lands; they are located on State land. The GLO approves plans and grants a coastal easement that leases the State's submerged land for use as a boathouse. The GLO reviews a proposed boathouse's footprint but not its height. Thus, the GLO reviews a boathouse's length into the channel for navigation purposes but does not review its aesthetic impact. As part of the permitting process, GLO notified the Gulledges' neighbors of their application and offered an opportunity to object.

Sullivan objected to the proposed boathouse's original location, asserting that it was too close to his property line and made access to his boathouse more difficult. After meeting with the GLO and Sullivan, the Gulledges agreed to move their proposed boathouse closer to the Wester property to the south and to knock down their existing boathouse, which was only two years old at the time. Sullivan agreed to withdraw his objection.

After they submitted their original construction plans, the Gulledges noticed that some other boathouses in Galveston County (but not in the Blue Point

---

[2] The yacht is over 20 feet tall, sleeps six people, and has three cabins and a small kitchen.

5

subdivision) had covered rooftop decks. Robert Gulledge testified that a deck on top of their boathouse would provide an area to socialize with family and friends and a clearer view of the boats coming down the channel. The Gulledges revised their plans to include a deck 25 feet above the water level, with an aluminum-covered roof at least 10 feet above the deck.[3] The second story, like the first, would not be enclosed, but it would have a spiral staircase, side railings, "minimal" lighting, diagonal braces, and a small cargo lift without sides. The roof over the 1200-square-feet deck would be supported by piers, and the new height of the boathouse would be 39.5 feet instead of the original 25-feet height.

Wester and Sullivan objected to the redesign, asserting that the second story would block their view of the waterway. They testified that they had no objection to a boathouse that was comparable in height to their own—around 17 feet high—or to the first design for a 25-foot boathouse. The GLO informed Wester and Sullivan that it does not regulate boathouse height.[4] The GLO approved the Gulledges' boathouse footprint and construction began.

---

[3]     The deck's rooftop has a peak that is 3-feet 6-inches high. According to expert testimony from an architect, if the roof was removed but the deck remained, a guardrail would still be required under applicable building codes.

[4]     The GLO did, however, charge the Gulledges an additional fee for their boathouse's second story, which is the agency's custom because of the risk of increased debris in the water after a storm.

After the Gulledges obtained the GLO's authorization and began the boathouse construction, Wester and Sullivan initiated the underlying suit, asserting claims for intentional private nuisance, negligent private nuisance, and invasion of privacy. Wester and Sullivan focused their suit on and limited their request for injunctive relief to the second story.

At trial, Wester and Sullivan each testified that the Gulledges' proposed boathouse blocked the water view from their property and that the boathouse was significantly larger than any other in the area. Wester and Sullivan each also stated—and photographs confirm—that the second story deck allows its occupants to look down into their backyards. Additionally, Wester testified about some adverse health effects he attributes to the presence of the oversized boathouse, including higher blood pressure.

Wester and Sullivan also presented testimony from two other residents who agreed that the Gulledges' boathouse was unlike the others in the neighborhood. One testified that, if the Gulledges had built that boathouse next to his property, he would have moved. The other testified that the Gulledges' boathouse blocks his water view as well.

A local realtor testified that the Gulledges' boathouse would decrease the value of Wester's and Sullivan's properties because of the diminished view, but he did not quantify the difference in value. He also testified that it would be harder to

7

sell Wester's and Sullivan's properties because the Gulledges' boathouse was "out of character."

The Gulledges presented counter testimony from two neighbors that they were not bothered by the Gulledges' boathouse. They also presented the testimony of another realtor, who testified that the Gulledges' boathouse would benefit the value of the neighborhood properties by showing prospective buyers the potential to build larger boathouses in the community.

Wester and Sullivan assert that the second story of the Gulledges' boathouse obstructs their water view. The Gulledges' boathouse does not have siding; therefore, when empty, it only partially blocks the view the first 25 feet above water, but there would be additional view obstruction due to the planned railing, diagonal braces, and staircase leading to the second-story deck, as well as the proposed copper roof and gutter in the upper portion of the two-story structure and the piers that support the nearly 40-feet tall structure. When the Gulledges' yacht is docked, the view would be more obstructed on the lower level, though the upper deck level would be unaffected.

But it is undisputed that each Blue Point resident's view is blocked to varying degrees by their neighbors' boathouses. The Sullivan's boathouse is 17 feet tall and has solid-wood siding; therefore, it completely blocks the Gulledges' north-eastern view for the first 17 feet above water level. Robert Gulledge's brother, Jed, owns

8

land in the community and has a boathouse that is roughly 26 feet tall and 60 feet long. Another neighbor, Williams Keys, has a boathouse that is 81 feet long. And, to the extent some of the boathouses are not enclosed, when their owners have their boats docked, their neighbors' views are obstructed by the docked boats. Moreover, the Gulledges' yacht is not the only large boat in the neighborhood; at least two other homeowners have yachts.

Additional view obstruction is caused by landscaping choices. For example, Sullivan has a number of trees and extensive vegetation on his land that partially obstruct the Gulledges' view.

Still more potential view obstruction may result from the homes themselves. The community restrictions permit residents to build two-story homes as close as five feet from their neighbor's property line and the waterline. A two-story house[5] that is five feet from the waterline would partially obstruct the water views from the neighboring properties.

These visual obstructions, however, are less significant from each owner's second story. All three homeowners involved in this suit—the Gulledges, Sullivan, and Wester—have two-story homes, and their second stories are roughly 17 feet high and have large windows to provide a view of the channel. According to Robert

---

[5] Jed Gulledge has a home on Blue Point Road that is 55 feet above the normal tide of channel.

Gulledge, each owner can see passing ships and the Kemah bridge from their second stories even when his yacht is parked in the boathouse because of the difference between his boat height (21.5 feet) and the deck floor (25 feet) and because of the absence of siding on his boathouse.

The jury found that the Gulledges did not intentionally cause a nuisance and that the boathouse did not invade Wester and Sullivan's privacy. The jury found the Gulledges liable for negligent nuisance but awarded no past damages. After trial, the trial court rendered a judgment for negligent nuisance, including a permanent injunction. The permanent injunction limited the roof height of the Gulledges' boathouse to 25 feet above mean high tide and prohibited use of the deck for social gatherings.

### Standard of Review

In a legal-sufficiency review, the court determines whether reasonable and fair-minded people could arrive at the factfinder's conclusion, after considering all evidence that supports the verdict and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will conclude that the evidence is legally insufficient to support the finding only if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more

than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. We review the evidence in the light most favorable to the judgment. *Id.* at 822.

## Negligent Nuisance

In their first issue, the Gulledges challenge the legal sufficiency of the evidence supporting the negligent nuisance claim.

### A. Definition of nuisance

The Texas Supreme Court recently undertook the task of clarifying private nuisance law. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580 (Tex. 2016). The Court explained that the law of "nuisance" seeks to balance a property owner's right to use his property "as he chooses in any lawful way" against his duty to refrain from using it in a way that "injure[s] another." *Id.* at 590–91 (quoting *Gulf, Colo. & Santa Fe Ry. Co. v. Oakes*, 58 S.W. 999, 1000 (Tex. 1900)). With that principle in mind, the Court defined "nuisance" as "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Id.* at 593 (quoting *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003)).

According to the *Crosstex* Court, a nuisance does not refer to a cause of action but instead to "the particular type of *legal injury* that can support a claim or cause of action seeking legal relief." *Id.* at 594. "The law of nuisance recognizes that certain

11

injuries to a person's right to the 'use and enjoyment of property' can . . . constitute a form of legal injury for which a legal remedy will be granted." *Id.* at 594.

The Court explained that "the condition the defendant causes may interfere with a wide variety of the plaintiffs' interests in the use and enjoyment of their property. It may, for example, cause physical damage to the plaintiffs' property, economic harm to the property's market value, harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property." *Id.* at 596. In fact, the Court explained, "virtually any disturbance of the enjoyment of the property may amount to a nuisance." *Id.* at 596 (quoting WILLIAM L. PROSSER, LAW OF TORTS § 90 (3d ed. 1964)).

But, importantly here, to rise to the level of nuisance, the interference must satisfy two other requirements: it must (1) be "substantial" in light of all the circumstances and (2) cause "discomfort or annoyance" that is "unreasonable." *Id.* at 595.[6]

---

[6] The Court explained, for instance, that "while noises or odors from a horse stable might occasionally or minimally interfere with the enjoyment of neighboring land, they can create a nuisance only if the stable is so kept, or so used, as to destroy the comfort of persons owning and occupying adjoining premises, and impair their value." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 595 (Tex. 2016) (internal quotations and citations omitted). Similarly, "because gunpowder must be stored somewhere, its storage can create a nuisance when it is a constant source of apprehension and alarm, prevents the plaintiffs from renting their land at any price, and substantially reduces the land's market value." *Id.* (internal quotations and citations omitted).

The first limitation—the substantiality requirement—"sets a minimum threshold that confirms that the law 'does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result.'" *Id.* at 595 (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS § 86 (5th ed. 1984)). The Court emphasized that foul odors, dust, noise, and bright lights must be "sufficiently extreme" to constitute a nuisance. *Id.* at 595 n.8.[7] In determining whether the interference is substantial, a court may review whether the use impairs the adjoining property's market value. *Id.* at 595. The substantiality test is fact-specific and includes, "for example, the nature and extent of the interference, and how long the interference lasts or how often it recurs." *Id.* at 595–96.

The second limitation is that the "discomfort or annoyance" must be unreasonable—i.e, that "'the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation." *Id.* at 596 (quoting

---

[7]     The Court quoted but added an emphasis to its 2004 opinion in *Schneider National Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004), *holding modified on other grounds, Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474 (Tex. 2014), when it included the following sentence in footnote eight: "There is no question that foul odors, dust, noise, and bright lights—*if sufficiently extreme*—may constitute a nuisance." *Id.* at 595 n.8.

RESTATEMENT (SECOND) OF TORTS § 829A).[8] The Court emphasized that the unreasonableness inquiry focuses on the conduct's effect, not the conduct itself, *id.* at 596–99, and that the test is an objective one that views the effect from the standpoint of a "persons of ordinary sensibilities." *Id.* at 596, 599–600. This reasonableness "determination requires balancing a wide variety of factors, depending on the specific facts." *Id.* at 596; *see id.* at 600–01 ("To establish a cause of action for which the law provides a right to relief, . . . there must not only be an injury or loss but it must have been occasioned by the commission of a legal wrong, that is, violation of legal right and a breach of legal duty." (internal quotations and citations omitted)).

Finally, the Court set forth a liability standard of care. *Id.* at 604. There are three classifications for private nuisance: intentional nuisance, negligent nuisance, and strict-liability nuisance. *Id.* at 602, 604–609. A negligent nuisance "claim is governed by ordinary negligence principles." *Id.* at 607. Accordingly, Wester and Sullivan were required to prove that the Gulledges owed them a duty, they breached the duty, and Wester and Sullivan suffered damages as a proximate cause of the breach. *See id.* In addition, Wester and Sullivan had to prove that the Gulledges' "negligent conduct caused a nuisance, which in turn resulted in [Wester's and

---

[8] The Court also described the nuisance created by a horse stable as "destroy[ing] the comfort of persons owning and occupying adjoining premises, and impair[ing] their value." *Id.* at 595.

14

Sullivan's] damages." *Id.* Thus, "a nuisance may result from 'a failure to take precautions against a risk apparent to a reasonable man.'" *Id.* (quoting PROSSER, LAW OF TORTS § 88).

**B.    Wester and Sullivan did not show a substantial interference that unreasonably affects their use and enjoyment of their property**

The Gulledges contend that a view impairment cannot support a nuisance claim. On the other hand, Wester and Sullivan maintain that *Crosstex* left the issue of whether a nuisance exists to the jury. *Id.* at 609 (observing that questions of whether interference with use and enjoyment of property is "substantial" or "the effects of such an interference on the plaintiffs are unreasonable" are generally "questions of fact for the jury to decide").[9]

We conclude that it is unnecessary for us to determine whether Texas law, post-*Crosstex,* erects a bright-line barrier against all view-impairment nuisance claims because there is legally insufficient evidence of a substantial inference that unreasonably affects Wester's and Sullivan's use and enjoyment of their land. *See id.* at 609 ("A court may decide the issues as a matter of law only if the underlying facts are undisputed or, in light of all the evidence, reasonable minds cannot differ." (internal quotations and citations omitted)). While the witnesses differ in their

---

[9]    *See id.* at 600 (stating that "determination of whether a defendant's interference with a plaintiff's use and enjoyment of land is substantial or whether any particular effect of that interference is unreasonable requires consideration and balancing of a multitude of factors").

15

conclusions about the impact of the Gulledges' boathouse, the photographs show the extent of the visual impairment, and the testimony regarding the neighborhood and other landowners' relative conduct is undisputed. We turn to applying the undisputed facts to the *Crosstex* factors for measuring the impact of the boathouse's interference.

First, we examine "the nature of the interference." *Id*. at 609. There was no invasion onto the plaintiffs' property. Unlike cases where light, odor, or smoke invade an adjoining property, the effect of the Gulledges' conduct was not on the plaintiffs' land itself. Even if view impairment could potentially have economic or psychological effects, Wester and Sullivan did not present any expert testimony quantifying any economic harm. And the jury, in its response to the damages jury question, rejected a psychological harm claim: it found that Wester and Sullivan did not suffer any "damages for annoyance or discomfort, caused by a nuisance that impairs the use and enjoyment of real property."

Second, we consider "the character and nature of the neighborhood, each party's land usage, and social expectations" as well as "the extent to which others in the vicinity are engaging in similar conduct." *Id*. at 600. These factors underscore that the record presents no substantial and unreasonable interference. The unique characteristics of the subdivision and the channel show that the use of large boathouses (which impair water views) is not unexpected. There were no deed

16

restrictions, city regulations, or GLO provisions that regulated the sizes of boathouses. The subdivision landowners purchased their homes with knowledge that city regulations permitted homes to be built higher than the Gulledge's boathouse and as close as five feet from the water, which would create an even larger visual impairment than the Gulledges' boathouse. Wester and Sullivan knew that the channel was deep and led to Galveston Bay, making it a prime location for yachts. Indeed, they purchased their properties, in part, so they could watch parades of yachts and other boats. And if the landowners owned and temporarily docked a yacht outside their homes, the moored boats would block an adjoining neighbor's view of the channel. If the yacht owners wanted to store their boats adjacent to their own property, as Wester and Sullivan do for their boats, they would need comparatively large boathouses to store them. Indeed, Wester and Sullivan have boats and boathouses that would be viewed by many as large. Other landowners had yachts even longer than the Gulledges' new yacht, and boathouses are the one constant feature for all neighboring homes. Thus, social expectations were that homeowners could purchase the lots with the plan to store yachts there in their accompanying boathouses. The vegetation, particularly tall trees, creates additional visual obstructions. And the narrow lot size and resulting density, as well as the close proximity of the homes to their boathouses, add even more visual obstructions and present an obvious risk of additional visual obstructions. As noted, Wester and

17

Sullivan do not challenge all these present visual obstructions to their view. They instead challenge the open-sided second story of the Gulledges' boathouse. Considering the parties' reasonable expectations and the already present view impairment, this record presents no evidence that the second story of the boathouse caused a substantial interference that unreasonably affected what Wester and Sullivan could and should have expected.

The "defendant's motive" is another factor for determining whether any interference is substantial or its effects unreasonable. *Id.* The jury rejected the claim of intentional interference. And the undisputed evidence showed that the Gulledges took some steps to minimize the visual obstructions. First, they moved the boathouse to accommodate Sullivan. Then, they elected not to add wooden siding so as to minimize the visual impairment caused by the boathouse. Next, they designed other features, such as the handrails, cargo elevator, and staircase, to minimize the visual obstruction caused by the second story. Short of not erecting a cover or handrails for a deck, Wester and Sullivan have not identified anything that could be done to minimize the visual obstruction created by a second-story deck.

Finally, we examine the extent of the interference and how long it lasts or how often it reoccurs. *Id.* at 595–96. The Gulledges testified that they intend to dock their boat at their Blue Point residence three-to-four months annually, so the full extent of the obstruction will last less than eight or nine months annually. Regardless of its

18

height, the Gulledges' boathouse does not impair Wester's and Sullivan view looking immediately east to the ship channel from their land. It does, however, impair their view if they look to the direction where the Gulledges' boathouse stands (i.e., if Wester looks to the northeast and Sullivan looks to the southeast). But the obstruction created by the Gulledges' boathouse's second story is only partial; while impaired, photographs show that residences can see through the open-sided second story of the boathouse. In contrast, the Sullivan's boathouse obstructs the view for the first 17 feet even more than the Gulledges' boathouse because its sides are covered with solid wood, while the Gulledges' boathouse has no siding. The Gulledges' boathouse is a partial—not total—visual obstruction. Bob Randall, an architect who designed the boathouses for Wester, Sullivan, and the Gulledges, testified that the Gulledges' boathouse is "two floating planes supported by wood structure piles that are 70 feet long. Architecturally the roof plane and the deck plane are separate. And approximately 80 percent of that side area is open so that one can view through the structure. It does not have a mansard roof or an appendage hanging down or wall-type that restricts the view corridor."

Wester and Sullivan argue that, because they presented multiple people in the neighborhood to testify that the Gulledges' boathouse would disturb their sensibilities, they have presented evidence in support of this element of their negligent nuisance action. But this argument overlooks the *Crosstex* Court's holding

19

that, to rise to the level of a nuisance, the defendant's conduct must substantially interfere with and unreasonably affect the use and enjoyment of property. *See id.* at 593–94. Those two requirements are not satisfied on this record, given that the second story is open with only the supporting structural beams and the narrow deck and roof-line planes obstructing the views.

Finally, Wester and Sullivan argue that their negligent nuisance claim is supported by the manner in which the Gulledges obtained permits from the GLO and the Army Corps. Wester and Sullivan recognize that the GLO and Army Corps do not regulate the height of structures that extend into the water. Yet they argue that the boathouse "was non-compliant with the plans originally approved" because the ultimate height was greater than the originally-proposed height.[10] Likewise, they argue that "the Gulledges did not notify the neighbors of the additional height added to the boathouse" without establishing that the Gulledges had any obligation to notify them of such or how this led to any legal injury. These arguments do not

---

[10]    Wester and Sullivan argue in their brief that "the evidence at trial was that the only permit the Gulledges ever received . . . did not authorize any construction over 25 feet.  This alone would support the jury's finding of negligence." There are a number of problems with this argument. They cite no authority in support of their assertion. It is inconsistent with their concession elsewhere in their brief that the GLO and Army Corps do not regulate the height of structures. They brought a negligent nuisance claim, not a general negligence claim, and the jury was instructed on negligent nuisance. And they provide no explanation for how they have standing to complain about the permitting process.

change the nature and character of the neighborhood or the nature and character of the interference.

The evidence is legally insufficient to support the judgment against the Gulledges for negligent nuisance and the related injunction. We therefore sustain the Gulledges' first issue.[11]

## Conclusion

We reverse the trial court's judgment on Wester's and Sullivan's negligent nuisance claim and render a take nothing judgment against Wester and Sullivan.


Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Caughey.

Justice Higley, concurring.

---

[11] Because it would not result in greater relief, we do not reach the Gulledges' remaining two issues concerning the factual sufficiency of the evidence and the scope of the injunction. *See* TEX. R. APP. P. 47.1.